CHICAGO, B. & Q. R. Co. v. PAUL KRISKI.

[FILED SEPTEMBER 17, 1890.]

1. **Malicious Prosecution**: PROBABLE CAUSE.    In an action of P. K. against the C., B. & Q. R. Co. for malicious prosecution in the arrest and trial of the plaintiff for the larceny of railroad ties, on the oath and evidence of B. F. P., the agent of defendant, *held*, that if, from the evidence, the agent had reasonable ground for suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief

that the accused was guilty of the offense, and that the agent believed that he was guilty, then there was probable cause for the prosecution of the accused, and therefore malice was not to be presumed on the part of defendant or its agent.

2. ———: ———: New Trial. The court below having so instructed the jury upon the trial, and the evidence clearly warranting the instructions given, and the jury having returned a verdict for the plaintiff, *held*, error in overruling the defendant's motion for a new trial.

Error to the district court for Platte county. Tried below before Post, J.

*J. B. Strode, Marquett & Deweese,* and *M. Whitmoyer,* for plaintiff in error, cited: *Dunbier v. Day,* 12 Neb., 596; *Meyer v. R. Co.* 2 Id., 342; *Turner v. O'Brien,* 5 Id., 543; Cooley, Torts, 210, 211, 213; *Ross v. Langworthy,* 13 Neb., 495; 1 Addison, Torts [6th Ed.], 225 and cases cited.

*George G. Bowman,* and *Sullivan & Reeder, contra,* cited: *Johnson v. Miller,* 29 N. W. Rep. [Ia.], 743; *Ross v. Langworthy,* 13 Neb., 492; *Chapman v. Dunn,* 56 Mich., 31; *A. & N. R. Co. v. Bailey,* 11 Neb., 333; *Moller v. Moller,* 22 N. E. Rep. [N. Y.], 169.

Cobb, Ch. J.

This action is brought on error to the district court of Platte county.

The plaintiff alleged in the court below that the defendant falsely and maliciously, and without reasonable or probable cause therefor, caused the plaintiff to be charged before a justice of the peace of Platte county, with having on the 20th day of May, 1887, unlawfully and feloniously stolen and carried away twenty-five railroad ties, of the value of $5, the property of defendant; that said charge was reduced to writing and sworn to by Benjamin Pinneo, an employe of defendant who at the time was in the service of defendant, and in making said charge was acting within

the scope of his employment and authority; that the defendant, through said employe, on the 23d day of May, 1887, caused said justice to make out a warrant for the apprehension of plaintiff, and falsely and maliciously, and without reasonable and probable cause therefor, caused plaintiff to be arrested on said charge, and to be imprisoned against his will in the common jail of said county; that a trial was had and that plaintiff in this action was acquitted and discharged; that he was innocent of the charge so made against him; that by reason of the premises, plaintiff was greatly injured in his credit and reputation, and brought into public scandal, infamy, and disgrace, and has suffered great anxiety and pain of body and mind, and has been damaged in the sum of $1,900, for which said sum he asks judgment.

Defendant in its answer in the lower court alleged that on or about the 20th day of May, 1887, railroad ties belonging to it, of the value of $5, had been stolen, taken, and carried away from it, in said Platte county; that two persons, believed to be Peter Kriski and Paul Kriski, father and son, the latter the plaintiff in this action, were seen at said date loading, taking, and carrying away from defendant's track in said county said railroad ties, and hauling and taking them to the residence of the said Peter Kriski; that Benjamin Pinneo, having good and probable cause to suspect and believe that said Peter and Paul Kriski committed said offense, made complaint before J. C. Cowdry, a justice of the peace in and for said county, charging them jointly with stealing said ties, upon which charge said Peter and Paul were arrested as alleged, held in custody for trial, and on the 25th day of May, 1887, tried, and said Peter was found guilty by a jury, and Paul was found not guilty; that the said complaint was made without malice and upon reasonable and probable cause for believing that the plaintiff, Paul Kriski, was guilty as charged.

The plaintiff replied denying each and every allegation of new matter contained therein.

There was a trial to a jury March 29, 1889, with a verdict for the plaintiff for $250.

The defendant's motion for a new trial was overruled, and judgment entered upon the verdict, and upon which the plaintiff in error assigns errors for rehearing:

" 1. The court erred in admitting the testimony offered by the defendant herein, which was objected to by the plaintiff herein, as shown by the record and the rulings of the court excepted to at the time.

" 2d. The court erred in rejecting testimony offered by the plaintiff herein, which error the plaintiff herein excepted to at the time.

" 3d. For errors of law occurring at the trial and duly excepted to by the plaintiff herein.

'· 4th. The court erred in overruling the motion of the plaintiff herein to set aside the verdict of the jury and for a new trial.

" 5th. The court erred in giving the 9th paragraph of its instructions to the jury.

"6th. The court erred in giving the 10th paragraph of its instructions to the jury, as not applicable to the issues, and misleading."

On the trial the plaintiff called B. F. Pinneo who testified that he resided in Lincoln, Nebraska, in May, 1887, and that he then was, and still is, in the employ of defendant; that it was in the line of his duty to protect the company from thefts and to prosecute thieves and like characters; that he had been in the employ of the company since June, 1881, and that he made the complaint against the defendant in error before J. C. Cowdry, justice of the peace of Platte county, in May, 1887. This witness was afterwards recalled by defendants, in the district court, and testified that he was the same who signed the complaint against Peter and Paul Kriski, charging them with steal-

ing railroad ties from the defendant; that at the time stated he received a letter from the company's superintendent, McConniff, of the B. & M. division, written by the section foreman, David McDuffy, giving information of the loss of ties, with directions for witness to pay attention to the business. Witness went with the letter to Columbus, and there saw McDuffy, and his son John, and John Mitcek, who informed witness of the stealing of railroad ties from the line of the road; that they had seen two persons loading ties on a wagon, start and drive on north from the line of the road; that John McDuffy had been sent to observe where and by whom the ties were taken, and had followed the parties up to the house of Peter and Paul Kriski, who were in the yard unhitching their team from the wagon on which the ties were then loaded. On hearing this circumstantial account of the apparent theft of the ties, the witness procured Geo. Harmon, a deputy sheriff, to accompany him to Peter Kriski's house; that coming within a short distance of the place they saw a son of Peter Kriski herding cattle, who told them, in answer to inquiries, that his father and older brother had hauled some railroad ties, and pointed in the direction of both the lines of the B. & M. and U. P. roads. The witness asked where his elder brother was, and the boy said he was up at the house, about the horses. Witness and the deputy sheriff then went to where Paul, the plaintiff, was engaged with the horses, near the house, and asked him about the ties; he said "they had got some ties and flood-wood about the bridge," pointing the same way, to the lines of both roads mentioned; that the boy, Paul, told conflicting stories as to where the ties came from; they then went to the house and had quite a talk with Peter Kriski, who said he got the ties on the railroad; there were from seven to fifteen ties on the wagon, and ties were scattered all around the yard. Witness asked Peter Kriski if he wanted to buy the ties, and he replied with

the inquiry what was wanted for them, and was told thirty cents each. Kriski said they were old and rotten and not worth that; there was no one present except deputy sheriff, Peter Kriski, and witness.

It appears that at this time neither the witness nor the deputy sheriff could converse in German or Polish, nor could Kriski speak or understand English but imperfectly; that Pinneo and Harmon returned to the town of Columbus and, procuring an interpreter, went again to Kriski's and told him, through the interpreter, that he would have to pay thirty cents each for the ties, which he refused. After returning to town and procuring a warrant the deputy sheriff arrested Peter Kriski and his son Paul and brought them before J. C. Cowdry, a justice of the peace. Witness had no other conversation or intercourse with the parties arrested than that stated, and had never before seen or heard of either one of them; that he had no ill feeling towards either, and his only motive in causing their arrest was the same as in all other cases of punishment for crime, and was a matter of duty only with him.

By counsel for defendant:

Q. State whether you believed they were the parties who had taken the railroad ties.

A. I did fully believe it, or would not have made the complaint. I was acting in good faith in the prosecution of the complaint.

Returning to the evidence of the plaintiff, Charles Schroeder testified that he knew Benjamin Pinneo, by sight, and knew Peter Kriski, knew of his arrest for stealing railroad ties; that he speaks the German tongue as also does witness; that witness interpreted between Pinneo and Kriski shortly before the latter was arrested and tried.

By counsel for plaintiff:

Q. Was there anything said in that conversation as to where Kriski got the ties found at his place?

A. (Over the objections of defendant.) Yes, sir; Kriski

stated that he had not stolen them, and that they had not been stolen from the B. & M. railroad at all; that he had received them from the U. P. Co.'s section boss; that a young fellow had been working under the boss and brought them there; that his name was Peters, and that one Barnish had taken the ties from the river.

John Herbert, a witness for the plaintiff, testified that he lived at Benton in the year 1887; that he was employed as section foreman on the Union Pacific railroad; that L. Peters worked for the company, under him, at several different times, and nearly every season part of the time; that he lived at different places while working under witness, and that for the last two years with his father-in-law, Peter Kriski, prior to May, 1887, and for a short time on the Bowman farm; that Kriski's was two miles west and a little north from Benton; remembers that in May, 1887, it was alleged that railroad ties were stolen from the B. & M. railroad. Witness cannot say if Peters worked with him just at that time, but he did shortly afterwards, and during the time that he worked and lived at his father-in-law's, Kriski's, witness let him have some ties from time to time; that witness saw Pinneo, at Benton, a year and a half ago when he was down to see us for a witness, claiming that ties had been stolen from the B. & M. road. It was the case before J. C. Cowdry at Columbus; that Pinneo had some conversation with Peters and witness and asked witness if he had given Peters any railroad ties, and witness told him that he had, and there was something said about new ties, and witness told him that he had given Peters a new tie that was broken which he took away; didn't remember that he told Pinneo at the time that the old and new ties he had seen at Kriski's had come from the U. P. Co.'s road; this was the forenoon of the day of the trial which was heard after noon.

George Hoagland, a witness for plaintiff, testified that he lived in Colfax county, distant two and a half miles

west and a little north of Benton, on the farm adjoining to Kriski's; remembers that it was said there had been railroad ties stolen from the B. & M. road in May, 1887; that during that morning he saw Peter Kriski (but did not see Paul) planting corn, with a planter, a little eastward of his house, sometime towards noon-day, at which time young McDuffy came to his house and made inquiries as to who lived at the house below, their names and appearance, etc. Witness hesitated to reply, and asked him his business, etc.; he said they had been stealing ties from the B. & M. road; that he had followed them up, and described their team ; witness told him he was mistaken, that he had just come up from there, and saw the old man planting corn that forenoon.

Peter Kriski was sworn and examined for the plaintiff and testified through an interpreter; that he lived in Colfax county in May, 1887; that he knows B. F. Pinneo, who visited him in that month and year, at his farm; that he could not talk with him, and had an interpreter brought by Pinneo, who told him he should pay $40.

Q. For what?

A. For railroad ties.

Q. What ties?

A. Old ties.

Q. Where were they?

A. In my yard.

Q. Did he say what he would do with you if you did not pay the forty dollars ?

A. He would arrest me; and wanted to get me arrested.

Q. Did you pay him, and why not?

A. No. Should I pay him any money, if I was innocent?

Q. Did he make any charges or accusations against you there?

A. He accused me of having me arrested if I did not want to pay.

Q. Did he accuse you of any crime?

A. He charged me with being a thief, that I had stolen ties.

Q. What did you tell him?

A. That the ties were from my son-in-law, L. Peters; that was when I refused to pay the $40. Pinneo went away and afterwards the same sheriff who was with Pinneo returned and arrested him and his son Paul, bringing them to Columbus before the justice of the peace late in the evening.

The testimony of the witness as to what occurred in and about the justice's court, and especially as to what was said and done by Schroeder, the interpreter, is not important to report, but he stated that while he told his story to the interpreter, the interpreter did not talk with Pinneo at all. The witness knew the young man McDuffy, saw him in May, 1887, but did not talk to him; that he, McDuffy, talked to witness in regard to the Barnishes, father and son, who were there, "and came there to his yard" with a wagon and team; witness was planting corn when he saw them, on Friday; on Tuesday following witness was arrested; had not been to the river that day, nor had his son Paul; that his son-in-law, Peters, had hauled ties from the Bowman farm with a mule team.

It appeared from his cross-examination that the interpreter mentioned as accompanying Pinneo and the deputy sheriff to his house was a shoemaker from Columbus, named Garbert, whose whereabouts were unknown at the time of the trial.

The plaintiff was sworn in his own behalf and testified, that he remembered the day that McDuffy came to his father's house, in May, 1887, about noon; that on that morning he had been hauling wood for his brother-in-law, L. Peters, and helping him move from the Bowman place to his father's; that they had a mule team, and had some railroad ties in their wagon brought away from the Bow-

man place to "our place"; that when they got to his father's house Theo. Barnish and Steve Barnish, his son, came along there, after witness, from the direction of the river; they had a wagon and team; witness's father had been planting corn that morning; the Barnishes had an iron gray and bay horse in their team; his father had a white mare and dark brown horse, not resembling the other team much; saw young McDuffy come up there after the Barnishes came, from the same direction, on foot; he went down to Barnish's wagon, and showed something, and said something; Barnish and his son were in their wagon; McDuffy talked to them, but not to witness or to his father; he saw witness unhitching the team but said nothing to him; that Barnish does not look like the witness's father, nor does witness look like Barnish's son; that Pinneo asked him where they got the ties, and he told him they were not their ties but belonged to Peters; that Joe Garbert was sitting in the buggy, but witness talked to Pinneo and not with Garbert. Witness was arrested, taken to Columbus, at 9 P. M. and put in jail.

L. Peters, a witness for the plaintiff, testified that he resides in Colfax county; that his business is working on the U. P. railroad as section hand under one Herbert as his boss; that he lived with his father-in-law, Peter Kriski; had every year got section ties from his railroad boss, and while living at the Bowman place, when he moved from there he moved the ties to Kriski's. Herbert gave him the ties. In May witness moved to Richland; had ties at that time, and left them at Kriski's. The day it was claimed that somebody had stolen ties witness was moving from the Bowman place. Paul Kriski was with him, and they had a mule team, a cross between bay and yellow; remained at Kriski's until noon; when unhitching the team, Barnish and his son Steve came up; we had some float-wood on the wagon; their team was an iron gray and bright bay; old man Kriski was planting corn, his team was a white

mare and dark brown horse; witness was talking to Barnish when young McDuffy came up from the south, the same direction that Barnishes came; Paul Kriski was then unhitching the team in the yard; McDuffy did not talk with either of the Kriskis; neither one resembles the Barnishes; Barnish has gray whiskers, a bald head, and is nearly fifty years old; witness knew Pinneo, saw him first when he came to subpœna witness on the Kriski trial; he told witness and Herbert that Kriski had stolen the ties; witness said not; that the ties were his, that he left them there; and he said these are new ties, but there were but two new ties, split and broken, and were given to witness by the section boss, who was present and told him so; this talk with Pinneo was the same day before the trial.

Upon the trial, one David McDuffy testified on behalf of the defendant, in the court below, that he was a section foreman in the service of defendant at the time of the prosecution complained of; that he as such section foreman had charge of the railroad ties belonging to the defendant and on his section of defendant's road; that a short time prior to the arrest and prosecution of plaintiff and his father, he had piled two piles of railroad ties belonging to the defendant on the right of way, ready for loading onto cars, and that all in one of the piles, containing more than 200 ties, were stolen; that about the 20th day of May, 1887, he saw two men with a team loading some of these ties a few rods west of the railroad bridge across the Platte river; that the men would load on a few ties and then get up on the road-bed and look around as if watching to see if any one saw them; that they loaded on ties and drove away; that he sent one of his section men, John McDuffy, his son, to follow the team and see where they were going with the ties; that he got on top of the hand car and watched the team closely, and saw it plainly, and that it was driven into the grove at Peter Kriski's place, that being the home also of Paul Kriski, a son of Peter Kriski; that John

15

McDuffy reported to him and told him it was Peter and Paul Kriski who loaded and hauled the ties; that he reported to defendant's superintendent at Lincoln that ties and bridge timber belonging to defendant were being stolen; that the superintendent sent Mr. Pinneo to look after the matter; that he saw Pinneo within a very few days; that they were on the defendant's railroad track, near where the ties had been taken from, and that he pointed out to Pinneo the place to which the ties had been taken; that he told Pinneo all he had seen himself and also what John McDuffy, who followed the wagon, had reported to him; that he told Pinneo that it was Peter and Paul Kriski who had stolen the ties.

John McDuffy testified that he was employed as a section hand upon defendant's railroad, and was working on the section with his father, David McDuffy, who was section foreman; that the section hands had been missing ties, and one day while at work on the road, at some distance from the bridge, they noticed a team and two men near the bridge at the place where the ties were piled up; that the men would load on ties a short time, and then get on the track and look about them, and go back and load on more ties; that when they got loaded they started off, and at his father's request he followed them to Kriski's house; that while following them he could see that the wagon was loaded with ties; that at Kriski's house he saw Peter and Paul Kriski unhitching the team from a wagon on which twenty or thirty ties were loaded, and that there were ties scattered around the yard; that after he left Kriski's house we went to a neighbor of the Kriskis and described the two men who were unhitching the team at Kriski's house, and that the neighbor said it was Peter Kriski and his son; that he then reported to his father what he had seen, and that he afterward told Pinneo all he had observed; that he did all this before the commencement of the criminal prosecution against the Kriskis; that

he told Pinneo that Peter and Paul Kriski had stolen the ties of the defendant.

John Mitcek, a witness on behalf of the defendant, testified that he was employed by the defendant and was working under section foreman David McDuffy, and was with him at the time the two men were seen loading ties on defendant's right of way, in May, 1887; that the team was driven in the direction of Kriski's grove, and that John McDuffy followed it; that ties were missing from the place where they had been piled; that they were stolen that day or the day before. On cross-examination he said these men with the team stood right where the ties were and that he saw them put some of them on the wagon.

Benjamin Pinneo, upon whose action in prosecuting plaintiff this action is based, testified that he received a letter from defendant's superintendent (which had been written by Mr. McDuffy to the said superintendent) with directions to attend to the matter; that within a few days he went to Columbus and there saw David McDuffy, John McDuffy, and John Mitcek, the witnesses whose testimony is hereinbefore abstracted; that David McDuffy told him that there had been a lot of defendant's railroad ties stolen, and told him the direction they went, and pointed out the place they had been taken to; told him that his son, John McDuffy, had followed them to the house. He further testified that John McDuffy also told him that "he was down there with his father working on the section, and they saw somebody loading ties down the track, and his father started him cornerways, and gave him instructions to follow them if it took a week, and he told me he followed that team up the road to that house in the grove, and that Paul Kriski and Peter Kriski were there in the yard; I think he said they were unhitching the team from the wagon; I asked him very particular about it; I didn't want to make any mistake;" that he then went and got the deputy sheriff to go with him to Kriski's place; that

before they reached the house they saw a son of Peter Kriski's herding cattle near the road; that this boy told him and the deputy sheriff that his father and older brother had hauled some ties, and pointed in the direction from whence the defendant's ties were taken when asked where they got them; that he and the deputy sheriff then went to where Paul, the plaintiff, was engaged, near the house, and asked him about the ties; that "he said they had gotten some ties and flood-wood at the bridge, and I asked him where, and he pointed the same way;" that the boy Paul told different stories in trying to tell them where the ties came from; that he then went to the house and that he and the deputy sheriff had a talk with Peter Kriski; that they asked him where he got the ties, and he said he got them on the railroad; that he then asked Kriski if he wanted to buy them, and that Kriski asked the price; that when he was told the price was thirty cents a tie, he said they were not worth that; that he (Pinneo) then went back to town (Columbus) and got an interpreter and took him out to Kriski's house and told him that he wanted thirty cents apiece for the ties, and that Kriski said he wouldn't pay for them; that Peter Kriski told several different stories about the ties, and that his last story was that he bought them from the U. P. foreman; that he then went back to town and made complaint before the justice of the peace, charging the said Peter and Paul with the larceny of said ties. The witness further testified that he had never seen or heard of the plaintiff or his father before he went to look after this matter; that he had no ill feeling toward them; that he believed these parties were the parties who had taken the ties; that his only motive was to punish them for the crime charged. In rebuttal to the testimony of plaintiff's witness, Schroeder, Pinneo said he had never spoken to Schroeder nor had Schroeder spoken to him, and that Schroeder had not told him anything about the old man Kriski having said he received the ties from the U. P. R. R.

Geo. Harmon, a witness on behalf of the defense, testified that he was deputy sheriff of Platte county at the time of the arrest of the Kriskis, and that he made the arrests; that before any complaint was made or warrant issued, he went with Pinneo to Kriski's house; that before they reached the house they talked with one of Kriski's boys, who said his father and a brother had hauled the ties; that he and Pinneo then went to where the plaintiff was and talked with him, and that he, plaintiff, said they got the ties over at the bridge; that they then went to and talked with Peter Kriski about where he got the ties, and that he told two or three different stories about the matter. "I think he said some one gave them to him the first time, and then he said he had bought them of the U. P. section foreman."

The defendant also called J. C. Cowdry, Esq., as witness, who testified that he was the justice of the peace of Platte county in May, 1887, before whom Peter and Paul Kriski were charged with stealing railroad ties, and were tried by a jury; that the entries of that trial were on pp. 8, 9, of his docket of that year, which he had with him, and by which proof was offered of the conviction of Peter Kriski of the offense charged, which, being objected to by plaintiff's counsel, was sustained by the court, and the offer of evidence overruled.

The giving of the paragraphs 9 and 10 of the court's instructions to the jury is assigned as error:

"9. The mere belief of Pinneo in the guilt of the plaintiff will not of itself justify the prosecution complained of. He could not close his eyes to facts within his knowledge which tended to prove plaintiff's innocence. On the other hand, he was not required, at his peril, to accept as true the denial of defendant or other parties. If all the known facts in the case, including such denial, were sufficient to induce a reasonable ground of suspicion of plaintiff's guilt, then you could not find that the prosecution was without probable cause.

"10. Should you find that the witness Pinneo demanded $40, or any other sum of money, from the plaintiff, or his father, for which sum he agreed to not prosecute said witness, or the plaintiff, such fact may be considered by you in determining whether or not said Pinneo acted maliciously; but such demand, if made, would be no evidence of want of probable cause, and should not be considered for that purpose."

The first three errors assigned are neither of them presented· in the brief of counsel, and it is not, therefore, deemed of importance to further consider them here.

The cogent argument of the brief is directed to the assumption that the verdict was contrary to the instructions to the jury, and is not sustained by the evidence. This proposition is somewhat embarrassed by the unusual circumstance that it is not directly presented in an assignment of error, but may be. entitled to be considered under the fourth error, that the court erred in overruling the defendant's motion for a new trial. Its application will be seen in the following instructions of the court:

"4. If the preponderance is with the defendant, or if the testimony is evenly balanced upon any one or more of the material questions in this case, you will have to find for the defendant.

"5. The material allegations which are put in issue by the pleadings herein, and which the plaintiff is required to establish by a preponderance of testimony are:

"First—That the witness Pinneo, in instituting the prosecution complained of, was acting as the agent of the defendant and within the scope of his authority as such agent.

"Second—That said Pinneo had no just or reasonable cause for such prosecution, or for believing the plaintiff guilty of the crime of larceny.

"Third—That said Pinneo in the said prosecution acted maliciously; that is, was actuated by motives of malice toward the plaintiff.

"6. That Pinneo was acting for the defendant in some capacity appears to be undisputed from the testimony; hence, on that branch of the case you will confine your inquiry to the question whether or not he was acting within the scope or line of his employment or agency. If you find from the testimony that Mr. Pinneo was authorized by the defendant company to institute the prosecution against the plaintiff for stealing its ties, then it would appear that he was acting within the scope of his authority.

"7. Probable cause for criminal prosecution is defined to be a reasonable ground for suspicion supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person accused is guilty of the offense charged.

"8. If the plaintiff has satisfied you that the defendant's agent had no such reasonable ground for suspicion of plaintiff's guilt, as explained in this charge, you will be justified in finding that no probable cause existed for the prosecution complained of. The question of probable cause in this case does not, however, depend upon whether or not the plaintiff actually stole ties from the defendant; neither does the question of probable cause depend upon the question of malice of defendant's agent; but the question is: Were the facts and circumstances within the knowledge of such agent, and upon which he acted, sufficient in themselves to raise a reasonable ground of suspicion in the mind of an ordinarily cautious man, and did such agent believe plaintiff guilty of stealing said ties? If such reasonable ground of suspicion existed within the knowledge of defendant's agent who instituted the prosecution, and if he actually believed plaintiff guilty, then he had probable cause therefor, and you should find for the defendant, even if you should find also that plaintiff did not in fact steal said ties.

"9. The mere belief of Pinneo in the guilt of the plaintiff will not of itself justify the prosecution complained of.

He could not close his eyes to facts within his knowledge which tended to prove plaintiff's innocence. On the other hand, he was not required, at his peril, to accept as true the denial of defendant or other parties. If all the known facts in the case, including such denial, were sufficient to induce a reasonable ground of suspicion of plaintiff's guilt, then you could not find that the prosecution was without probable cause."

Does the evidence, viewed in the light of these instructions, sustain the verdict? If this can be so considered, the court was justified in overruling the motion for a new trial, but, if otherwise, it was the duty of the court to have set aside the verdict.

Pinneo, as the agent of defendant, was acting in an useful and necessary capacity under the general instructions of the superintendent of the railroad company, and was located at a point nearly 100 miles distant from the plaintiff, who was an utter stranger to him. The witness McDuffy was a local section foreman of the company, near to the residence of the plaintiff and to the scene of the transactions testified to by all the witnesses. McDuffy informed McConniff, the superintendent and immediate superior of Pinneo, that railroad ties, the property of the defendant, had been recently stolen from the line of the road, and directed Pinneo to investigate the depredation, ascertain the guilty parties, and, if possible, bring them to justice, with such reparation to the company as his general instructions implied. Under these orders he proceeded to Platte county to the section of the road under McDuffy's charge, and was informed by that official "that there had been a lot of rairoad ties stolen, and pointed out the direction and place to which the property had been taken, and that his son, John McDuffy, had followed the property and the parties to the house;" and was further informed by John McDuffy "that he and his father, while working on the section under their charge, saw somebody loading ties

down on the track; that his father directed him to follow them, and that he did follow the team up the road to the house in the grove, and discovered that Paul Kriski, the plaintiff, and Peter Kriski, his father, were there in possession and were then unhitching the team from the wagon loaded with ties." The agent testifies that he questioned these informants narrowly as to circumstances detailed in order that he should make no mistake as to his own action. He then, accompanied by the deputy sheriff, went to Kriski's place, and, before coming to the house, saw the younger brother of the plaintiff herding cattle near the road, who told them, in answer to inquiries, "that his father and older brother had hauled some railroad ties," and when asked where from, pointed to the direction whence the defendant's ties had been taken. The plaintiff also said to the deputy sheriff that "they had got some ties and flood-wood at the bridge," and when asked where from, pointed out the same direction that the younger brother had, and upon further inquiry told conflicting stories about the ties. The father, Peter Kriski, being asked where he got the ties, said that he got them on the railroad, and upon an offer to sell them to him at thirty cents each, refused to buy them at that price, but gave different accounts as to their possession.    The last one was that he had bought them of the U. P. Company's foreman.

At the Kriski place there was found a large amount of said railroad ties of the kind and quality of those stolen from defendant according to the information received by the agent, and in possession of them the agent found the Kriskis, both father and son.    Upon these apparent facts Peter Kriski and his son Paul were charged by the agent Pinneo with the larceny of the ties.    The agent testified that they were total strangers to him, and that he was free of any malice or ill-will in their prosecution.

In rebuttal of the testimony of Schroeder for the plaintiff, the agent testified that he had never spoken to that

witness, and had not told him anything about old man Kriski having gotten the ties of the U. P. Railroad Company. This evidence is corroborated by Kriski, who stated that he talked with Schroeder only, and that Schroeder did not talk with Pinneo for him at the time stated by that witness.

From the commencement of the prosecution forward, the testimony is conflicting. Pinneo heard statements from the elder Kriski, from the son-in-law, and probably others, in explanation of the possession of the property and casting doubt as to the accuracy of the information previously given as to the guilt of the parties.

The court charged the jury in the 9th instruction that the agent "was not required, at his peril, to accept the denial of the defendant or other parties; that if all the known facts in the case, including such denial, were sufficient to induce a reasonable ground of suspicion of plaintiff's guilt, it could not be found that the prosecution was without reasonable cause."

It is undoubtedly one of the most usual circumstances attending accusations of crime that the accused should deny their guilt and endeavor to explain away any suspicious facts leading to their arrest. And notwithstanding the small confidence placed in such assertions, the absence of such denial or explanation is liable to be regarded as tending to a confession. Can it be said that the agent Pinneo, with a due regard to his duty to his employer, could have, after receiving the information from the McDuffys, seemingly confirmed by the possession of the property by the Kriskis, part of it upon the wagon as if lately hauled upon the premises, accepted, as conclusive and sufficient to turn him back from the pursuit of the property, the denial of these persons as to their guilt or their conflicting explanations of their possession of it? But we may not be put to this inquiry, but rather rest upon the fact that the court in its charge held that no such duty was incumbent upon him.

C., B. & Q. R. Co. v. Kriski.

The question then recurs whether the court was bound to enforce the law thus laid down, but this depends upon the conclusion of that court, and of this, as 'to the sufficiency of the facts communicated to the agent, and within his knowledge, to establish the existence, or the absence of probable cause for the arrest and prosecution of the plaintiff.

The court in its seventh instruction correctly charged the jury that probable cause for criminal prosecution is a reasonable ground for suspicion supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the accused is · guilty of the offense charged.

From the information, circumstances and facts presented to the agent Pinneo by the McDuffys, and his own ocular demonstration of the property in the possession of the Kriskis, can it be said that he was not warranted, as a cautious man, in the belief that larceny had been committed, and that those in possession of the property, and not accounting for it, were the guilty parties? If this question be answered in the negative, the justification of the defendant is clear, because the agent, who alone could testify as to his belief, testified that he believed the plaintiff to be guilty, and the court instructed the jury, and we believe properly, that the agent was not bound to accept, at his peril, the denials of the accused, or of other parties, and such denials were the only circumstances in evidence which tended in any degree to disprove or contradict the strong presumption of guilt under the criminating circumstances of the case.

The legal and logical reasons, therefore, seem to me to be unquestionable that a verdict for the plaintiff upon such grounds and evidence, and under such instructions as the jury were charged with, should have been set aside on motion, and that the court erred in overruling the defendant's motion for a new trial.   Having reached this conclusion the

fifth and sixth assignments of the plaintiff in error will not be further considered in this opinion. The judgment of the district court is reversed and this cause is remanded for a new trial.

REVERSED AND REMANDED.

THE other judges concur.